Barry I. Levy
Michael A. Sirignano
Priscilla D. Kam
Vincent J. Pontrello
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees
Insurance Company, GEICO Indemnity Company,
GEICO General Insurance Company and
GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

GOVERNMENT EMPLOYEES INSURANCE
COMPANY, GEICO INDEMNITY COMPANY,
GEICO GENERAL INSURANCE COMPANY and
GEICO CASUALTY COMPANY,                                    Docket No.: _____(     )

                              Plaintiffs,

              -against-

TIME TO CARE PHARMACY, INC.,
MICHAEL TABULOV, and
JOHN DOE NOS. "1" THROUGH "5"

                              Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## COMPLAINT

Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company,

GEICO General Insurance Company and GEICO Casualty Company (collectively, "GEICO" or

"Plaintiffs"), as and for their Complaint against Defendants, Time to Care Pharmacy, Inc., Michael

Tabulov, and John Doe Nos. "1" through "5" (collectively, "Defendants"), hereby allege as

follows:

1.     This action seeks to terminate a massive, on-going fraudulent scheme perpetrated by the Defendants who have exploited the New York "No-Fault" insurance system by submitting more than $2,453,200.00 in fraudulent pharmaceutical billing to GEICO.  Specifically, the Defendants submitted, or caused to be submitted, thousands of fraudulent claims to GEICO seeking payment for a set of specifically targeted medically unnecessary "pain relieving" topical prescription drug products including topical pain gels, ointments and patches –  primarily in the firm of topical Diclofenac Sodium Gel 3% and Lidocaine 5% Ointment – (collectively, the "Fraudulent Topical Pain Products"), as well a limited variety of various other medications including oral nonsteroidal anti-inflammatories and muscle relaxers (together with the Fraudulent Topical Pain Products, the "Fraudulent Pharmaceuticals").

2.     Defendants Time to Care Pharmacy, Inc. ("Time to Care") and its owner, Michael Tabulov ("Tabulov"), dispensed the Fraudulent Pharmaceuticals to individuals involved in automobile accidents and eligible for insurance coverage under policies of insurance issued by GEICO (the "Insureds").  To exploit the Insureds for financial gain, the Defendants targeted the prescription and dispensing of the Fraudulent Topical Pain Products in place of other effective, but much-less costly prescription and non-prescription drug products because the Defendants were able to acquire the Fraudulent Topical Pain Products at low cost and then dispense and bill for them at exorbitant prices.

3.     As an essential part of the fraudulent scheme, the Defendants entered into illegal, collusive agreements with various prescribing healthcare providers (the "Prescribing Providers") and unlicensed laypersons (the "Clinic Controllers") who work at or are associated with various multidisciplinary medical clinics that almost exclusively treat No-Fault patients (the "No-Fault Clinics"). Pursuant to these collusive agreements, in exchange for kickbacks or other financial

incentives, the Defendants steered the Prescribing Providers and Clinic Controllers to direct large volumes of prescriptions for the targeted Fraudulent Topical Pain Products to Time to Care.

4.  To effectuate the scheme and maximize profits, the Defendants intentionally targeted a handful of specific pain medications (i.e., the Fraudulent Topical Pain Products) to dispense to Insureds based solely on the medications' exorbitant pricing and high profit margins. Then, in exchange for kickbacks or other incentives, the Defendants caused the Prescribing Providers and Clinic Controllers to steer prescriptions for these exorbitantly priced Fraudulent Topical Pain Products to Time to Care without any regard for genuine patient care.

5.  The Defendants' scheme to steer the Prescribing Providers and Clinic Controllers to routinely prescribe and direct prescriptions to Time to Care for large volumes of the Fraudulent Topical Pain Products pursuant to their collusive arrangements egregiously inflated the charges submitted to GEICO.  For example, Time to Care typically submitted claims to GEICO seeking $1,811.68 to $1,887.20 for a single tube of Diclofenac Sodium Gel 3% and $1,219.04 for a single tube of Lidocaine 5% Ointment.

6.  The Defendants' scheme not only inflated the charges submitted to GEICO and other insurers, but also posed serious risks to patients' health, safety, and well-being.  For example, the Defendants, without regard to genuine patient care, repeatedly dispensed large quantities of diclofenac sodium which has risks that include gastrointestinal effects and major cardiovascular events, such as heart attack and stroke, and large quantities of lidocaine, which can cause heart arrhythmia, blood toxicity, and symptoms of overdose if not used correctly.

7.  By this action, GEICO seeks to recover more than $345,218.00 that the Defendants stole from it, along with a declaration that GEICO is not legally obligated to pay reimbursement to Time to Care of over $1,073,819.00 in pending fraudulent No-Fault claims for the Fraudulent

Pharmaceuticals that the Defendants submitted or caused to be submitted through Time to Care because:

(i)    Time to Care billed for pharmaceutical products that were medically unnecessary and prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care;

(ii)    The Defendants participated in illegal, collusive relationships in which the Defendants steered the Prescribing Providers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to Time to Care in exchange for unlawful kickbacks and other financial incentives;

(iii)    the Defendants intentionally targeted a specific set of pharmaceutical products (i.e., the Fraudulent Topical Pain Products) that they acquired at low cost and had Time to Care dispense in large volumes to Insureds at egregious charges, in place of other effective, less costly pharmaceuticals; and

(iv)    the Defendants made and continue to make false and fraudulent misrepresentations to GEICO by submitting or causing to be submitted charges for the Fraudulent Pharmaceuticals under the name of Time to Care pursuant to illegal, invalid, and duplicitous prescriptions.

8.    The Defendants fall into the following categories:

(i)    Time to Care is a New York corporation engaged in a fraudulent scheme in which it dispensed the Fraudulent Pharmaceuticals, pursuant to illegal, collusive agreements and predetermined protocols, without regard to genuine patient care, in order to submit to GEICO and other New York automobile insurers claims for reimbursement of No-Fault benefits to which it is not entitled;

(ii)    Tabulov is the record owner of Time to Care; and

(iii)    John Doe Nos. "1" through "5" are persons and entities, presently not identifiable, who along, with Time to Care and Tabulov, participated in the operation and control of Time to Care, including facilitating the illegal, collusive agreements with the Prescribing Providers and Clinic Controllers.

9.    The Defendants' scheme began in 2019 and continues uninterrupted to the present day as the Defendants continue to seek collection on the fraudulent billing.

10.     As discussed more fully below, the Defendants at all times have known that: (i) the Fraudulent Pharmaceuticals billed through Time to Care were medically unnecessary, and prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit patients for financial gain, without regard for genuine patient care; (ii) the Defendants participated in illegal, collusive relationships in which they steered the Prescribing Providers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to Time to Care in exchange for unlawful kickbacks and other financial incentives; (iii) the Defendants intentionally targeted a specific set of pharmaceutical products (i.e., the Fraudulent Topical Pain Products) that they acquired at low cost and had Time to Care dispense in large volumes to Insureds at exorbitant charges, in place of other effective, less costly pharmaceuticals; and (iv) the Defendants made and continue to make false and fraudulent misrepresentations to GEICO by submitting or causing to be submitted charges for the Fraudulent Pharmaceuticals pursuant to illegal, invalid, and duplicitous prescriptions.

11.     Based on the foregoing, Time to Care does not have – and never had – any right to be compensated for the Fraudulent Pharmaceuticals allegedly dispensed to GEICO Insureds.  The chart attached hereto as Exhibit "1" sets forth the fraudulent claims that have been identified to-date which the Defendants submitted, or caused to be submitted, to GEICO through the United States mail.  As a result of the Defendants' scheme, GEICO has incurred damages of approximately $345,218.00.

## THE PARTIES

### I.     Plaintiffs

12.     Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company are Nebraska

corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in New York.

## II.    **Defendants**

13.    Defendant Time to Care is a New York corporation, formed on or about March 29, 2019, with its principal place of business at 248-47 Jericho Turnpike, Bellerose, New York.

14.    Time to Care knowingly submitted fraudulent claims to GEICO and continues to seek reimbursement on unpaid fraudulent claims.

15.    Defendant Tabulov resides in and is a citizen of New York. Tabulov is the owner of Time to Care.

16.    John Doe Nos. 1-5 reside in and are citizens of New York.  John Doe Nos. 1-5 are individuals and entities, presently not identifiable, who, along with Time to Care and Tabulov, participated in the operation and control of Time to Care, including facilitating illegal, collusive agreements with the Prescribing Providers and Clinic Controllers, whereby they prescribed, or purport to prescribe, the Fraudulent Pharmaceuticals in exchange for kickbacks and other financial incentives from the Defendants

17.    Time to Care is connected to another pharmacy suspected of engaging in a similar fraud scheme, M&D Elite Pharmacy, LLC ("M&D Elite"), and which was recently sued by GEICO in the Eastern District of New York. See Government Employees Insurance Company, et al v. M&D Elite Pharmacy, LLC, et al, 20-cv-05662 (RRM) (RML). Specifically, among other things, Time to Care submitted billing to GEICO under M&D Elite's name and address and, on at least one occasion, M&D Elite issued a check for thousands of dollars to Time to Care that was processed at a check cashing agency. Time to Care also issued payments to various entities which, upon information and belief, were used by the defendants in the M&D Elite litigation to launder

money and generate kickbacks.  Further, M&D Elite and Time to Care received prescriptions from many of the same Prescribing Providers and No-Fault Clinics and even filled prescriptions for some of the same Insureds.

18.     Furthermore, Time to Care received prescriptions from multiple No-Fault Clinics that were identified in an ongoing criminal proceeding, captioned <u>USA v. Rose</u>, 19-cr-00789 (PGG).  In those criminal proceedings, the US Government has credibly alleged that the laypersons who own the various No-fault medical clinics (i) pay kickbacks to hospital workers, medical service providers, and police officers in exchange for confidential information of motor vehicle accident victims in New York; and (ii) accept kickbacks in exchange for allowing healthcare providers access to patients so they can bill for medically unnecessary services for patients being treated, or allegedly treated, at the No-Fault Clinics.

## JURISDICTION AND VENUE

19.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

20.     This Court also has original jurisdiction pursuant to 28 U.S.C. § 1331, over the claims brought under 18 U.S.C. §§ 1961 <u>et</u> <u>seq.</u>, the Racketeer Influenced and Corrupt Organizations ("RICO") Act, because they arise under the laws of the United States.

21.     In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

22.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and because this

is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

### I.    An Overview of New York's No-Fault Laws

23.    GEICO underwrites automobile insurance in the State of New York.

24.    New York's "No-Fault" laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the healthcare services that they need. Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101 et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65 et seq.)(collectively, referred to herein as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to the Insureds.

25.    No-Fault Benefits include up to $50,000.00 per Insured for necessary expenses that are incurred for health care goods and services.

26.    An Insured can assign his or her right to No-Fault Benefits to the providers of healthcare services in exchange for those services. Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for necessary goods and medical services provided, using the claim form required by the New York State Department of Insurance (known as the "Verification of Treatment by Attending Physician or Other Provider of Health Service," or, more commonly, as an "NF-3").   Alternatively, healthcare providers sometimes submit claims using the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 Form").

27.    Pursuant to New York's No-Fault Laws (11 N.Y.C.R.R. § 65-3.16(a)(12)), a healthcare provider is not eligible to receive No-Fault Benefits if it fails to meet any applicable New York state or local licensing requirement necessary to perform such services in New York.

28.     The implementing regulation adopted by the Superintendent of Insurance, 11 NYCRR § 65-3.16(a)(12), provides, in pertinent part, as follows:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet <u>any</u> applicable New York State or local licensing requirement necessary to perform such service in New York … (emphasis supplied).

29.     In <u>State Farm Mut. Auto. Ins. Co. v. Mallela</u>, 4 N.Y.3d 313, 320 (2005) and <u>Andrew Carothers, M.D., P.C. v. Progressive Ins. Co.</u>, 33 N.Y.3d 389 (2019), the New York Court of Appeals made clear that (i) healthcare providers that fail to comply with material licensing requirements are ineligible to collect No-Fault Benefits, and (ii) only licensed providers may practice a profession in New York because of the concern that unlicensed persons are "not bound by ethical rules that govern the quality of care delivered by a physician to a patient."

30.     Pursuant to New York Insurance Law § 403, the NF-3s and HCFA-1500 Forms submitted by a healthcare provider to GEICO, and to all other automobile insurers, must be verified by the health care provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

## II.     <u>An Overview of Applicable Licensing Laws</u>

31.     Pursuant to New York Education Law § 6808, no person, firm, corporation or association shall possess drugs, prescriptions or poisons for the purpose of compounding, dispensing, retailing, wholesaling or manufacturing, or shall offer drugs, prescriptions or poisons for sale at retail or wholesale unless registered by the New York State Department of Education as a pharmacy, wholesaler, manufacturer or outsourcing facility.

32.     Pursuant to 8 N.Y.C.R.R. § 29.1 pharmacies in New York are prohibited from "exercising undue influence on the patient or client, including the promotion of the sale of services, goods, appliances or drugs in such manner as to exploit the patient or client for the financial gain of the practitioner or of a third party."

33.     Similarly, 8 N.Y.C.R.R. § 29.1 prohibits pharmacies from "directly or indirectly offering, giving, soliciting, or receiving or agreeing to receive, any fee or other consideration to or from a third party for the referral of a patient or client or in connection with the performance of professional services."

34.     Pursuant to 8 N.Y.C.R.R. § 63.1(7) pharmacists or pharmacy interns shall conduct a prospective drug review before each prescription is dispensed, which review shall include screening for potential drug therapy problems due to therapeutic duplication, drug-drug interactions, including serious interactions with over-the-counter drugs, incorrect drug dosage or duration of drug treatment, drug-allergy interactions, and clinical abuse or misuse.

35.     New York Education Law § 6810 prohibits pharmacies from dispensing when a prescription form for a drug includes any other drug.  Separate prescriptions are required for each drug prescribed and dispensed.

36.     New York Education Law § 6810 prohibits persons and corporations, not licensed to issue a prescription, to willfully cause prescription forms, blanks, or facsimiles thereof to be disseminated to any person other than a person who is licensed to issue a prescription.

37.     Pursuant to New York Education Law § 6808, pharmacy owners and supervising pharmacists shall be responsible for the proper conduct of a pharmacy.

38.     New York Education Law § 6530(17) prohibits a physician from "exercising undue influence" on the patient by promoting the sale of drugs so as to exploit the patient for the financial gain of the licensee or of a third party.

39.     New York Education Law § 6530(18) prohibits a physician from "directly or indirectly" offering, giving, soliciting, receiving, or agreeing to receive any fee or other consideration to or from a third party in connection with the performance of professional services.

40.     New York Education Law § 6509-a, prohibits a professional licensee from "directly or indirectly" requesting, receiving, or participating in the division, transference, assignment, rebate, splitting, or refunding of a fee in connection with professional care or services including services related to drugs and/or medications.

### III.     The Defendants' Scheme Involving The Fraudulent Pharmaceuticals

#### A.     Overview of the Scheme

41.     Beginning in 2019, and continuing uninterrupted through the present day, Defendants Time to Care and Tabulov masterminded and implemented a fraudulent scheme in which they used Time to Care to exploit patients for financial gain by billing the New York automobile insurance industry for millions of dollars in exorbitant charges relating to the Fraudulent Pharmaceuticals purportedly provided to Insureds.

42.     Time to Care purported to be a storefront pharmacy operating in Nassau County, New York but instead was created to perpetrate a large-scale fraud scheme to exploit GEICO's Insureds, as well as insureds of other New York automobile insurers, through the prescribing and dispensing of the Fraudulent Pharmaceuticals while intentionally ignoring a vast array of prescription and over-the-counter ("OTC") medications readily available at a fraction of the cost.

43.     Tabulov is listed as the sole owner and operator of Time to Care, but there is no indication Tabulov ever owned or operated any other pharmacy prior to becoming the sole owner and operator of Time to Care, received any pharmaceutical training or education, or worked in the healthcare or pharmaceutical industry.

44.     Furthermore, unlike legitimate pharmacies dispensing a wide variety of pharmaceutical products, Time to Care's business was largely focused on a limited set of pharmaceutical products (i.e., the Fraudulent Topical Pain Products).

45.     In fact, Diclofenac Sodium Gel 3% and Lidocaine 5% Ointment accounted for approximately 90% of the total claims for reimbursement that Defendants submitted to GEICO. The claims the Defendants submitted through Time to Care for these specific Fraudulent Topical Pain Products resulted in more than $2,191,223.00 in billing to GEICO.

46.     The Defendants chose the Fraudulent Topical Pain Products because they knew that (i) similar over-the-counter drugs that could be recommended to Insureds are not covered expenses under the No-Fault Laws and (ii) they could acquire the Fraudulent Topical Pain Products at low cost and submit claims for reimbursement under the No-Fault Laws at exorbitant prices.

47.     In furtherance of the fraudulent scheme, the Defendants entered into illegal, collusive agreements with the Prescribing Providers and the Clinic Controllers where, in exchange for the payment of kickbacks of other financial incentives, they steered the Prescribing Providers and the Clinic Controllers to prescribe large volumes of medically unnecessary Fraudulent Topical Pain Products to Insureds treating at various No-Fault Clinics and to direct those prescriptions to Time to Care.

48.     The financial arrangements that the Defendants entered into included the payment of fees for ostensibly legitimate services such as marketing, advertising, consulting, billing, and/or

collection services.  In fact, however, these were "pay-to-play" arrangements made in exchange for prescriptions being steered to Time to Care.

49.      For example, Time to Care issued checks to entities that appear to have no legitimate business operations, which checks were illegally exchanged for cash at a check-cashing facility in New Jersey by an individual named Alla Kuratova. Kuratova has exchanged more than $35 million in checks, payable to hundreds of persons/healthcare entities besides Time to Care, for cash. See Gov't Empl. Ins. Co., et al. v. Zilberman, et al. Docket No. 1:20-cv-00209(FB)(RML), Docket No. 71.  Kuratova was previously indicted for recruiting individuals to act as phony patients in connection with an illegal prescription drug trafficking ring.  Further, M&D Elite – a pharmacy engaged in similar fraud – issued checks to Time to Care that were similarly cashed at a check cashing agency.

50.     The Prescribing Providers and the No-Fault Clinics that were the source of prescriptions steered to Time to Care also have been the subject of investigations and lawsuits commenced by various New York insurers with regard to their fraudulent billing and treatment practices, and have been the source of excessive, fraudulent treatment and billing schemes aimed at generating profits without regard to patient care.

51.     In fact, Time to Care received prescriptions from various No-Fault Clinics that were identified in USA v. Rose, 19-cr-00789 (PGG), including 2273 65th Street Brooklyn, New York, 488 Lafayette Avenue Brooklyn, New York, 6937 Myrtle Avenue Glendale, New York, and 717 Southern Boulevard Bronx, New York.   In that criminal action, the United States of America has credibly alleged that the laypersons who own the clinics (i) pay kickbacks to hospital workers, medical service providers, and police officers in exchange for confidential information of motor vehicle accident victims in New York; and (ii) accept kickbacks in exchange for allowing

13

healthcare providers access to patients so they can bill for medically unnecessary services for patients being treated, or allegedly treated, at the No-Fault Clinics.

52. In keeping with the fact that the Defendants illegally steered the Prescribing Providers and the Clinic Controllers to provide Time to Care with prescriptions for the Fraudulent Pharmaceuticals pursuant to predetermined fraudulent protocols, Insureds were never given the option to use a pharmacy of their choosing.

53. Instead, the Defendants colluded with the Prescribing Providers and Clinic Controllers to ensure that they directed the prescriptions for the Fraudulent Pharmaceuticals to Time to Care, regardless of the distance of this pharmacy from the Insureds or the No-Fault Clinics where they were treating.

54. In fact, not a single Insured who received prescriptions from Time to Care resided in Bellerose – the Nassau County village where Time to Care is located, while less than 4% of Insureds resided anywhere in Nassau County.

55. In most cases, Time to Care either purported to deliver or mail the Fraudulent Pharmaceuticals directly to Insureds' homes or the Fraudulent Pharmaceuticals were given to Insureds directly by the front desk staff at the various No-Fault Clinics.

56. In most cases, Insureds were not aware that a prescription for a Fraudulent Pharmaceutical was issued to them and dispensed by Time to Care until the medication was delivered to their homes or distributed to them by the front desk staff at the No-Fault Clinics.

57. The Defendants spearheaded their pharmaceutical fraud scheme involving the Prescribing Providers and the Clinic Controllers knowing that (i) the Fraudulent Pharmaceuticals were medically unnecessary, and prescribed and dispensed pursuant to predetermined protocols designed to exploit the patients for financial gain, without regard to genuine patient care; (ii) the

Fraudulent Pharmaceuticals were the product of illegal, collusive arrangements intended to inflate the billing from Time to Care to insurers and financially enrich the Defendants; (iii) the Defendants intentionally targeted the specific Fraudulent Topical Pain Products which they acquired at low cost and dispensed in large volumes to Insureds at inflated charges; and (iv) the Fraudulent Pharmaceuticals were prescribed and dispensed without regard for the availability of a wide range of other prescription and over-the-counter medications proven to have therapeutic effects and available at a fraction of the cost.

### B.     The Fraudulent Pharmaceuticals Were Prescribed and Dispensed Without Regard to Genuine Patient Care In Order to Exploit Patients for Financial Gain

58.     In basic terms, the goal of medical treatment is to help patients get better in a timely manner. Notwithstanding this basic goal, Insureds treated by the Prescribing Providers at the No-Fault Clinics associated with the Clinic Controllers – and who received pharmaceuticals from Time to Care – were virtually always subjected to a predetermined and unnecessarily prolonged treatment protocol, which completely lacked in individualized care and failed to utilize evidence-based medical practices with the goal of the Insureds' timely return to good health.

59.     Despite this basic goal, the treatment reports for the Insureds who received Fraudulent Pharmaceuticals from Time to Care almost uniformly reflected that the Insureds did not get better, did not return to good health, and did not experience improvement in their conditions such that the Insureds could terminate medical treatment expeditiously and return to normal activity.

60.     Rather, as part of the predetermined protocol, the Prescribing Providers produced generic, preprinted, boilerplate examination reports designed to justify continued, voluminous and excessive healthcare services that healthcare providers at the No-Fault Clinics purported to render

to the Insureds. These healthcare services included the prescription of excessive and medically unnecessary pharmaceutical drug products such as the Fraudulent Pharmaceuticals.

61.     Notwithstanding the creation of the examination reports, the Prescribing Providers' prescriptions for the Fraudulent Pharmaceuticals dispensed by Time to Care were based on predetermined protocols designed to exploit Insureds' for financial gain, without regard to the genuine needs of the patients.

62.     To the extent any examination was performed at all, the Prescribing Providers failed to document a detailed medical history of the patients to whom they prescribed the Fraudulent Pharmaceuticals.

63.     Prescribing a multitude of pharmaceutical drug products without first taking a detailed patient history demonstrates a gross indifference to patient health and safety, as the Prescribing Providers often did not know whether the patient was currently taking any medication or suffering from any comorbidity that would contraindicate the use of a particular prescribed drug.

64.     The Prescribing Providers also routinely failed to document in their examination reports whether the patients were intolerant of oral medications necessitating a prescription for a Fraudulent Topical Pain Product.

65.     The Prescribing Providers also routinely failed to document in their follow-up examination reports whether the Fraudulent Pharmaceuticals prescribed to a particular patient and dispensed by Time to Care were actually used by the patient.

66.     The Prescribing Providers also continuously failed to document in their follow-up examination reports whether the Fraudulent Pharmaceuticals prescribed to a particular patient and dispensed by Time to Care provided any pain relief to the patient or were otherwise effective for the purpose prescribed.

67.     At times, the recommendation and treatment plans of a Prescribing Provider's examination reports were inconsistent with the medications actually prescribed and dispensed. For example:

i.      Insured HX was allegedly involved in a motor vehicle accident on March 2, 2019. Thereafter, H.X. sought treatment with Metropolitan Medical and Surgical, P.C. ("Metropolitan Medical") at a No-Fault Clinic located at 488 Lafayette Avenue, Brooklyn, New York, and underwent an initial examination with Augustus Igbokwe, P.A. ("PA Igbokwe") on October 7, 2019.  PA Igbokwe did not document any medication under the treatment plan section of the examination report, thereby, indicating no medication was recommended or prescribed. Nevertheless, on October 9, 2019, Time to Care dispensed and billed for Lidocaine 5% Ointment, Baclofen, and Ibuprofen pursuant to a prescription allegedly issued by PA Igbokwe on dated October 9, 2019.

ii.     Insured TE was allegedly involved in a motor vehicle accident on September 1, 2019. Thereafter, T.E. sought treatment with Metropolitan Medical at a No-Fault Clinic located at 1611 East New York Avenue, Brooklyn, New York, and underwent an initial examination with PA Igbokwe on December 16, 2019. PA Igbokwe documented that Baclofen and Celebrex were to be prescribed under the treatment plan section of the examination report. Nevertheless, on December 17, 2019, Time to Care dispensed and billed for Baclofen, Celecoxib, and Lidocaine 5% Ointment, pursuant to a prescription allegedly issued by PA Igbokwe on December 17, 2019.

iii.    Insured GB was allegedly involved in a motor vehicle accident on September 19, 2019. Thereafter, G.B. sought treatment with Metropolitan Medical at a No-Fault Clinic located at 655 Richmond Avenue, Staten Island, New York, and underwent an initial examination with PA Igbokwe on November 25, 2019. PA Igbokwe documented that Ibuprofen was to be prescribed under the treatment plan section of the examination report. Nevertheless, on November 26, 2019, Time to Care dispensed and billed for Ibuprofen and Lidocaine 5% Ointment, pursuant to a prescription allegedly issued by PA Igbokwe on November 26, 2019.

iv.     Insured WA was allegedly involved in a motor vehicle accident on January 1, 2020. Thereafter, W.A. sought treatment with Joseph Raia, M.D. P.C. ("Raia PC") at a No-Fault Clinic located at 717 Southern Boulevard, Bronx, New York, and underwent an initial examination with Alford Smith, M.D. ("Dr. Smith") on January 21, 2020. In the medications section of his treatment plan, Dr. Smith recommended Tylenol and Motrin. Nevertheless, on January 27, 2020, Time to Care dispensed and billed for Cyclobenzaprine, Meloxicam, and Lidocaine 5% Ointment, pursuant to prescriptions allegedly issued by Dr. Smith on January 21, 2020. Dr. Smith performed a follow-up examination on February

26, 2020 and despite not recommending the patient receive any prescription medications, on March 2, 2020, Time to Care dispensed and billed for Cyclobenzaprine, Naproxen, and Lidocaine 5% Ointment pursuant to prescriptions issued by Dr. Smith on February 26, 2020.  On March 31, 2020, W.A. underwent another initial examination with Radha Gara, M.D. ("Dr. Gara") of Gara Medical, P.C. ("Gara Medical").  Dr. Gara's treatment plan included prescriptions for Naproxen, Ibuprofen, and Tylenol.  Despite this recommendation, on April 7, 2020, Time to Care dispensed and billed for Cyclobenzaprine and Lidocaine 5% Ointment pursuant to prescriptions allegedly issued by Dr. Gara on March 31, 2020.   Notably, Time to Care repeatedly submitted to GEICO claims for reimbursement pursuant to electronic prescriptions allegedly issued by Dr. Gara.   Dr. Gara was recently deposed as a nonparty witness in the matter of <u>Government Employees Inc. Co. et al. v. Custom RX Pharmacy LLC et al</u>, 20-cv-02622(CBA)(SJB) and testified under oath that he has never issued an electronic prescription and, in fact, does not even have the account credentials to do so.

v.   Insured MA was allegedly involved in a motor vehicle accident on September 7, 2019.  Thereafter M.A. sought treatment with Raia PC at a No-Fault Clinic located at 717 Southern Boulevard, Bronx, New York and underwent an initial examination with Olga Gibbons, M.D. ("Dr. Gibbons") on February 4, 2020. In the medication section of her treatment plan, Dr. Gibbons recommended Tylenol and Motrin.  Nevertheless, on February 11, 2020, Time to Care dispensed and billed for Gabapentin, Celecoxib, and Lidocaine 5% Ointment pursuant to prescriptions allegedly issued by Dr. Gibbons on February 4, 2020.

vi.   Insured AL was allegedly involved in a motor vehicle accident on March 5, 2020.  Thereafter, A.L. sought treatment with Metropolitan Medical at a No-Fault Clinic located at 1655 Richmond Avenue, Staten Island, New York and underwent an initial examination with Mary Cristin Perdue, M.D. ("Dr. Perdue") on June 2, 2020.  Dr. Perdue did not mark off or circle any of the preprinted medications listed in the recommendation section of her examination indicating no medications were recommended or prescribed to A.L. Nevertheless, on June 9, 2020, Time to Care dispensed and billed for Cyclobenzaprine, Naproxen, and Lidocaine 5% Ointment pursuant to prescriptions allegedly issued by Dr. Perdue on June 2, 2020.

vii.   Insured MT was allegedly involved in a motor vehicle accident August 20, 2019.  Thereafter, M.T. sought treatment with Metro Pain Specialist, P.C. ("Metro Pain") at a No-Fault Clinic located at 1100 Pelham Parkway, Bronx, New York and underwent an initial examination with Petronela Antohi, M.D. ("Dr. Antohi") on September 23, 2019.  Dr. Antohi's treatment plan included a prescription for Lidocaine 5% Ointment only.  Nevertheless, on September 30, 2019, Time to Care dispensed and billed for Lidocaine 5% Ointment <u>and</u> Cyclobenzaprine and Meloxicam pursuant to prescriptions allegedly issued by Dr. Antohi on September 23, 2019.

viii.   Insured JV was allegedly involved in a motor vehicle accident on December 17, 2019.  Thereafter, J.V. sought treatment with Bay Ridge Orthopedic Associates, P.C. ("Bay Ridge Ortho") at a No-Fault Clinic located at 476 Bay Ridge Parkway, Brooklyn, New York and underwent an examination with Howard Baum, M.D. ("Dr. Baum") on July 29, 2020.  Dr. Baum's treatment plan does not recommend any medications or indicate that any prescriptions for medications were issued.  Nevertheless, on July 30, 2020, Time to Care dispensed and billed for Naproxen and Diclofenac Sodium Gel 3% pursuant to prescriptions allegedly issued by Dr. Baum on July 29, 2020.

ix.   Insured TE (Claim No. 0410085990101145) was allegedly involved in a motor vehicle accident on September 1, 2019. Thereafter, T.E. sought treatment with Metropolitan Medical at a No-Fault Clinic located at 1611 East New York Avenue, Brooklyn, New York, and underwent an initial examination with PA Igbokwe on December 16, 2019. PA Igbokwe prescribed Celebrex and Baclofen. Nevertheless, on December 17, 2019, Time to Care dispensed and billed for Celecoxib, Baclofen and Lidocaine 5% Ointment, pursuant to a prescription allegedly issued by PA Igbokwe on December 16, 2019.

x.   Insured JA (Claim No. 0249893520101049) was allegedly involved in a motor vehicle accident on September 5, 2019. Thereafter, J.A. sought treatment with Metropolitan Medical at a No-Fault Clinic located at 560 Prospect Avenue, Bronx, New York, and underwent an outpatient visit with PA Igbokwe on January 9, 2020.  PA Igbokwe documented "Rx analgesics" in the assessment section of the report but did not indicate what types of analgesics to provide. Nevertheless, on January 13, 2020, Time to Care dispensed and billed for Lidocaine 5% Ointment, Cyclobenzaprine, and Ibuprofen pursuant to a prescription allegedly issued by PA Igbokwe on dated January 9, 2020.

68.   In further keeping with the fact that the Fraudulent Pharmaceuticals were not medically necessary and were prescribed and dispensed pursuant to fraudulent treatment protocols and collusive agreements, at times two or more Insureds involved in the same minor motor vehicle accident received prescriptions for the same set of Fraudulent Pharmaceuticals at the time of their initial examinations with a Prescribing Provider.

69.   An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact will all affect whether, how, and to what extent an individual is injured in an automobile accident.

70.     It is extremely improbable – to the point of impossibility – that multiple Insureds involved in the same automobile accident who treated with the same Prescribing Provider would routinely require the same pharmaceutical products at the same doses.

71.     Even so, and in keeping with the fact that the Fraudulent Pharmaceuticals were not medically necessary and were prescribed pursuant to predetermined protocols to maximize profits, at times two or more Insureds involved in the same minor motor vehicle accident received prescriptions for the same set of Fraudulent Pharmaceuticals at the time of their initial examinations with a Prescribing Provider. For example:

i.      On August 26, 2020, three Insureds – AC, WP, and LL – were involved in the same automobile accident. Thereafter, A.C., W.P., and L.L. all received treatment with Integrative Health Family NIP, PLLC ("Integrative Health") at a No-Fault Clinic located at 1568 Ralph Avenue, Brooklyn, New York with Igor Zilberman, M.D. ("Dr. Zilberman"). A.C., W.P., and L.L. were in different physical conditions and experienced the impact from different positions in the vehicle. Even so, pursuant to predetermined fraudulent treatment protocols and collusive agreements with the Defendants, after their initial examinations AC, WP, and LL were all issued prescriptions from Dr. Zilberman for Diclofenac Sodium Gel 3% and Cyclobenzaprine which were dispensed and billed by Time to Care.

ii.     On May 17, 2020, three Insureds – AMN, AM, and JM – were involved in the same automobile accident. Thereafter, A.M.N., A.M., and J.M. all received treatment with Integrative Health at a No-Fault Clinic located at 488 Lafayette Avenue, Brooklyn, New York with Dr. Zilberman. A.M.N., A.M., and J.M. were in different physical conditions and experienced the impact from different positions in the vehicle. Even so, pursuant to predetermined fraudulent treatment protocols and collusive agreements with the Defendants, after their initial examinations A.M.N., A.M., and J.M. were all issued prescriptions from Dr. Zilberman for Diclofenac Sodium Gel 3% and Cyclobenzaprine which were dispensed and billed by Time to Care.

iii.    On June 18, 2020, two Insureds – BAS and CF – were involved in the same automobile accident. Thereafter, B.A.S. and C.F. both received treatment with Graham Wellness Medical, P.C. ("Graham Wellness") at a No-Fault Clinic located at 150 Graham Avenue, Brooklyn, New York with Olasunkanmi Bhadmus, M.D. ("Dr. Bhadmus"). B.A.S. and C.F. were in different physical conditions and experienced the impact from different positions in the vehicle. Even so, pursuant to predetermined fraudulent treatment protocols and collusive

agreements with the Defendants, after their initial examinations B.A.S. and C.F. were both issued prescriptions from Dr. Bhadmus for Lidocaine 5% Ointment, Cyclobenzaprine, and an oral NSAID which were dispensed and billed by Time to Care.

iv.   On August 14, 2020, two Insureds – AM and CS – were involved in the same automobile accident. Thereafter, A.M. and C.S. both received treatment with Gara Medical at a No-Fault Clinic located at 717 Southern Boulevard, Bronx, New York with Dr. Gara. A.M. and C.S. were in different physical conditions and experienced the impact from different positions in the vehicle. Even so, pursuant to predetermined fraudulent treatment protocols and collusive agreements with the Defendants, after their initial examinations A.M. and C.S. were both issued prescriptions from Dr. Gara for Lidocaine 5% Ointment and Naproxen which were dispensed and billed by Time to Care.

v.   On August 1, 2020, two Insureds – CA and JN – were involved in the same automobile accident. Thereafter, C.A. and J.N. both received treatment with Pak Hong Sik M.D. Medical Care, P.C. ("Pak Medical") at a No-Fault Clinic located at 611 East 76th Street, Brooklyn, New York with Hong Pak, M.D. ("Pak"). C.A. and J.N. were in different physical conditions and experienced the impact from different positions in the vehicle. Even so, pursuant to predetermined fraudulent treatment protocols and collusive agreements with the Defendants, after their initial examinations C.A. and J.N. were both issued prescriptions from Pak for Lidocaine 5% Ointment and Cyclobenzaprine which were dispensed and billed by Time to Care.

vi.   On July 31, 2019, two Insureds – NA and SS – were involved in the same automobile accident. Thereafter, N.A. and S.S. both received treatment with Metropolitan Medical at a No-Fault Clinic located at 153-80 Rockaway Boulevard, Jamaica, New York with Stephanie Butschek, P.A. ("PA Butschek"). N.A. and S.S. were in different physical conditions and experienced the impact from different positions in the vehicle. Even so, pursuant to predetermined fraudulent treatment protocols and collusive agreements with the Defendants, after their initial examinations N.A. and S.S. were both issued prescriptions from PA Butschek for Diclofenac Sodium Gel 3%, Naproxen, and Cyclobenzaprine which were dispensed and billed by Time to Care.

vii.   On October 6, 2019, two Insureds – DA and AD – were involved in the same automobile accident. Thereafter, D.A. and A.D. both received treatment with Metro Pain at a No-Fault Clinic located at 1100 Pelham Parkway South, Bronx, New York with Antohi Petronela, M.D. ("Dr. Petronela"). D.A. and A.D. were in different physical conditions and experienced the impact from different positions in the vehicle. Even so, pursuant to predetermined fraudulent treatment protocols and collusive agreements with the Defendants, after their initial examinations D.A. and A.D. were both issued prescriptions from Dr. Petronela

for Lidocaine 5% Ointment, Naproxen, and Cyclobenzaprine which were dispensed and billed by Time to Care.

viii.  On June 5, 2020, two Insureds – OA and DD – were involved in the same automobile accident. Thereafter, O.A. and D.D. both received treatment with Joshua Persaud M.D., P.C. ("Joshua Persaud") at a No-Fault Clinic located at 60-40 82nd Street, Middle Village, New York with Denis Clarke, M.D. ("Dr. Clarke"). O.A. and D.D. were in different physical conditions and experienced the impact from different positions in the vehicle. Even so, pursuant to predetermined fraudulent treatment protocols and collusive agreements with the Defendants, after their initial examinations O.A. and D.D. were both issued prescriptions from Dr. Clarke for Lidocaine 5% Ointment, Naproxen, and Cyclobenzaprine which were dispensed and billed by Time to Care.

ix.  On September 29, 2020, two Insureds – CA and EP – were involved in the same automobile accident. Thereafter, C.A. and E.P. both received treatment with Metro Pain at 717 Southern Boulevard, Bronx, New York with Theodros Seyoum, P.A. ("PA Seyoum"). C.A. and E.P. were in different physical conditions and experienced the impact from different positions in the vehicle. Even so, pursuant to predetermined fraudulent treatment protocols and collusive agreements with the Defendants, after their initial examinations C.A. and E.P. were both issued prescriptions from PA Seyoum for Lidocaine 5% Ointment, Naproxen, and Cyclobenzaprine which were dispensed and billed by Time to Care.

x.  On September 10, 2019, two Insureds – DA and RA – were involved in the same automobile accident. Thereafter, D.A. and R.A. both received treatment with Metropolitan Medical at a No-Fault Clinic located at 2076 East 13th Street, Brooklyn, New York with Mark Gladstein, M.D. ("Dr. Gladstein"). D.A. and R.A. were in different physical conditions and experienced the impact from different positions in the vehicle. Even so, pursuant to predetermined fraudulent treatment protocols and collusive agreements with the Defendants, after their initial examinations D.A. and R.A. were both issued prescriptions from Dr. Gladstein for Lidocaine 5% Ointment, Naproxen, and Baclofen which were dispensed and billed by Time to Care.

### i.  **The Fraudulent Topical Diclofenac Gel and Lidocaine Ointment Prescriptions**

72.  In accordance with the fraudulent scheme discussed above, Time to Care primarily and routinely billed GEICO for exorbitantly priced Fraudulent Topical Pain Products primarily in the form of Diclofenac Sodium Gel 3% ("Topical Diclofenac") and Lidocaine 5% Ointment,

pursuant to duplicitous prescriptions solicited from Prescribing Providers and Clinic Controllers in exchange for kickbacks or other financial incentives.

73.     Not surprisingly, the Office of Inspector General of the U.S. Department of Health & Human Services issued a report which noted that diclofenac and lidocaine have been two of the most common products subject to fraud and abuse by pharmacies with questionable billing.  See Questionable Billing For Compounded Topical Drugs in Medicare Part D, OEI-02-16-00440 (August 2018).

a.   The Fraudulent Topical Diclofenac Gel

74.     The Defendants solicited the Prescribing Providers and the Clinic Controllers to provide them with voluminous prescriptions for Topical Diclofenac because the Defendants could readily buy Topical Diclofenac at low cost but have Time to Care bill GEICO and other New York No-Fault insurers huge sums based on egregiously high wholesale prices.

75.     Topical Diclofenac is a topical nonsteroidal anti-inflammatory drug ("NSAID") typically used to treat joint pain caused by osteoarthritis in the hands, wrists, elbows, knees, ankles, or feet.  It has not been proven effective for treating strains or sprains.

76.     The United States Food and Drug Administration ("FDA") requires that diclofenac sodium prescriptions contain a "Black Box Warning" indicating the potential for serious cardiovascular and gastrointestinal risks.

77.     A "Black Box Warning" is the strictest warning attached to the labeling of a prescription drug or product by the FDA and is designed to call attention to serious or life-threatening risks associated with the drug or product.

78.     Specifically, with every diclofenac sodium prescription, the FDA requires the patient be warned that: (i) diclofenac sodium may cause an increased risk of serious cardiovascular

thrombotic events, myocardial infarction, and stroke, which can be fatal; and (ii) diclofenac sodium may cause an increased risk of serious adverse gastrointestinal events including bleeding, ulceration, and perforation of the stomach or intestines, which can be fatal.

79.     Notwithstanding the most common uses for Topical Diclofenac, or the risks associated with the drug, the Defendants steered the Prescribing Providers to prescribe diclofenac sodium in the form of Topical Diclofenac, while they oftentimes recommended the patient continue the use of oral NSAIDs or simultaneously prescribed oral NSAIDs – such as celecoxib, meloxicam, ibuprofen, or naproxen – and other Fraudulent Pharmaceuticals including additional Fraudulent Topical Pain Products such as Lidocaine 5% Ointment.

80.     Prescribing Topical Diclofenac, while simultaneously prescribing or recommending the patient take oral NSAIDs, is therapeutic duplication which results in increased risk of adverse events with no additional therapeutic benefit.

81.     Therapeutic duplication is the prescribing and dispensing of two or more drugs from the same therapeutic class – such as oral and topical NSAIDs (e.g., naproxen and Diclofenac Gel 3%) – which puts the patient at greater risk of adverse drug reactions without providing any additional therapeutic benefit.

82.     Each year in the United States, approximately 4.5 million ambulatory care visits and 100,000 deaths occur as a result of adverse drug reactions.  A substantial number of these adverse drug reactions are the result of improper prescription practices associated with therapeutic duplication.  See, Mathew Witry, PharmD, PhD, Medication List Discrepancies and Therapeutic Duplications Among Dual Use Veterans, Federal Practitioner, 14 (September 2016).

83.     Nevertheless, Prescribing Providers consciously prescribed and the Defendants consciously dispensed Topical Diclofenac in conjunction with oral NSAIDs and/or Fraudulent

Topical Pain Products to numerous Insureds, thereby engaging in therapeutic duplication, despite the risks it posed to the Insureds' health and well-being.

84.     In the instant matter, by engaging in such therapeutic duplication, the Prescribing Providers and the Defendants put patients at increased risk of serious cardiovascular and gastrointestinal events (without any additional therapeutic benefit) as the use of oral NSAIDs increases the "Black Box Warning" risks associated with diclofenac sodium.

85.     The Prescribing Providers engaged in therapeutic duplication by simultaneously prescribing oral NSAIDs and Topical Diclofenac, and at times also contemporaneously prescribed muscle relaxants, such as cyclobenzaprine and baclofen, and/or other Fraudulent Topical Pain Products.  For example:

i.     Insured VL was allegedly involved in a motor vehicle accident on September 7, 2019. Thereafter, V.L. sought treatment with Metropolitan Medical at a No-Fault Clinic located at 2273 65th Street, Brooklyn, New York, and underwent an initial examination with PA Butschek on October 15, 2019. Despite the inherent risks of therapeutic duplication, PA Butschek prescribed both a topical and an oral NSAID in the form of Diclofenac Sodium Gel 3% and Naproxen which were dispensed and billed by Time to Care on October 16, 2019.

ii.     Insured YW (Claim No. 0665682430101015) was allegedly involved in a motor vehicle accident on July 30, 2019. Thereafter, Y.W. sought treatment with Metropolitan Medical at a No-Fault Clinic located at 152-80 Rockaway Boulevard, Jamaica, New York, and underwent an initial examination with PA Butschek on September 12, 2019. Despite the inherent risks of therapeutic duplication, PA Butschek prescribed both a topical and an oral NSAID in the form of Diclofenac Sodium Gel 3% and Naproxen as well as Cyclobenzaprine which were dispensed and billed by Time to Care on September 17, 2019.

iii.     Insured VS (Claim No. 0366497770101026) was allegedly involved in a motor vehicle accident on July 26, 2019. Thereafter, V.S. sought treatment with Metropolitan Medical at a No-Fault Clinic located at 152-80 Rockaway Boulevard, Jamaica, New York, and underwent an initial examination with PA Butschek on September 12, 2019. Despite the inherent risks of therapeutic duplication, PA Butschek prescribed both a topical and an oral NSAID in the form of Diclofenac Sodium Gel 3% and Naproxen as well as Cyclobenzaprine which were dispensed and billed by Time to Care on September 17, 2019.

iv.     Insured NA (Claim No. 0610475070101064) was allegedly involved in a motor vehicle accident on July 31, 2019. Thereafter, N.A. sought treatment with Metropolitan Medical at a No-Fault Clinic located at 152-80 Rockaway Boulevard, Jamaica, New York, and underwent an initial examination with PA Butschek on September 12, 2019. Despite the inherent risks of therapeutic duplication, PA Butschek prescribed both a topical and an oral NSAID in the form of Diclofenac Sodium Gel 3% and Naproxen as well as Cyclobenzaprine which were dispensed and billed by Time to Care on September 17, 2019.

v.     Insured JA (Claim No. 0644688370101036) was allegedly involved in a motor vehicle accident on August 21, 2019. Thereafter, J.A. sought treatment with Metropolitan Medical at a No-Fault Clinic located at 2273 65th Street, Brooklyn, New York, and underwent an initial examination with PA Butschek on October 15, 2019. Despite the inherent risks of therapeutic duplication, PA Butschek prescribed both a topical and an oral NSAID in the form of Diclofenac Sodium Gel 3% and Naproxen as well as Cyclobenzaprine which were dispensed and billed by Time to Care on October 16, 2019.

vi.     Insured VB was allegedly involved in a motor vehicle accident on July 26, 2019. Thereafter, V.B. sought treatment with Metropolitan Medical at a No-Fault Clinic located at 3040 Nostrand Avenue, Brooklyn, New York, and underwent an initial examination with PA Butschek on November 7, 2019. Despite the inherent risks of therapeutic duplication, PA Butschek prescribed both a topical and an oral NSAID in the form of Diclofenac Sodium Gel 3% and Naproxen, along with Cyclobenzaprine which were dispensed and billed by Time to Care on November 12, 2019.

vii.     Insured AFM was allegedly involved in a motor vehicle accident on September 24, 2019. Thereafter, A.F.M. sought treatment with Metropolitan Medical at a No-Fault Clinic located at 1568 Ralph Avenue, Brooklyn, New York, and underwent an initial examination with PA Igbokwe on September 24, 2019. Despite the inherent risks of therapeutic duplication, PA Igbokwe prescribed both a topical and an oral NSAID in the form of Diclofenac Sodium Gel 3% and Naproxen, along with Cyclobenzaprine which were dispensed and billed by Time to Care on September 26, 2019.

viii.     Insured VG was allegedly involved in a motor vehicle accident on December 10, 2019. Thereafter, V.G. sought treatment with Metropolitan Medical at a No-Fault Clinic located at 1611 East New York Avenue, Brooklyn, New York, and underwent an initial examination with PA Butschek on January 8, 2020. Despite the inherent risks of therapeutic duplication, PA Butschek prescribed both a topical and an oral NSAID in the form of Diclofenac Sodium Gel 3% and Naproxen, along with Cyclobenzaprine which were dispensed by Time to Care on January 10, 2020.

    ix.    Insured LN was allegedly involved in a motor vehicle accident on August 18, 2019. Thereafter, L.N. sought treatment with Metropolitan Medical at a No-Fault Clinic located at 1568 Ralph Avenue, Brooklyn, New York, and underwent an initial examination with PA Igbokwe on August 27, 2019. PA Igbokwe prescribed Diclofenac Sodium Gel 3% which was dispensed and billed by M&D Elite Pharmacy on August 29, 2019. Subsequently, October 1, 2019, L.N. sought treatment with Joseph Raia, M.D., P.C. at a No-Fault Clinic located at 1568 Ralph Avenue, Brooklyn, New York, and received trigger point injections from Joseph Raia, M.D. ("Raia").  Despite the inherent risks of therapeutic duplication, Raia prescribed a topical and an oral NSAID in the form of Diclofenac Sodium Gel 3% and Naproxen, along with Cyclobenzaprine which were dispensed and billed by Time to Care on October 3, 2019.

    x.    Insured AB was allegedly involved in a motor vehicle accident on November 15, 2019. Thereafter, A.B. sought treatment with QR Medical Services, P.C. at a No-Fault Clinic located at 1568 Ralph Avenue, Brooklyn, New York, and underwent an initial examination and Lidocaine injections with Muhammad Zakaria, M.D. ("Dr. Zakaria") on November 18, 2019. Despite the inherent risks of therapeutic duplication, Dr. Zakaria prescribed a topical and an oral NSAID in the form of Diclofenac Sodium Gel 3% and Naproxen, along with Cyclobenzaprine which were dispensed and billed by Time to Care on November 21, 2019.

86.    Not only are these practices part of a fraudulent scheme designed to maximize profit, but they also pose a risk to – and show a genuine disregard for – patient health and safety as they constitute therapeutic duplication and increase the risk of adverse drug reactions to the patients subjected to them

87.    The Topical Diclofenac was prescribed pursuant to collusive arrangements and predetermined treatment protocols, and without regard for patient care and safety, or the commercial availability of a wide range of FDA-approved medications, as well as over-the-counter medications, proven to have therapeutic effects and available at a fraction of the cost.

88.    In keeping with the fact that Topical Diclofenac was prescribed and dispensed pursuant to predetermined treatment protocols and without regard for patient care and safety, the initial examination reports prepared by the Prescribing Providers virtually never stated the medical basis for the prescriptions.

89.     In further keeping with the fact that the Topical Diclofenac was prescribed and dispensed pursuant to predetermined treatment protocols and without regard for patient care, the follow-up examination reports performed by the Prescribing Providers virtually never addressed whether the Topical Diclofenac prescribed provided any pain relief to the patient or was otherwise effective for the purpose prescribed, to what degree, or whether the patients experienced any side effects.

90.     The Defendants almost exclusively dispensed and billed for Topical Diclofenac in the form of Diclofenac Sodium Gel 3%, typically billing between $1,811.68 to $1,887.20 for a single tube of gel. The Defendants' total billing submitted through Time to Care to GEICO for Topical Diclofenac exceeds $1,207,865.00.

        a.   The Fraudulent Topical Lidocaine Ointment

91.     In addition to the egregious number of Topical Diclofenac prescriptions dispensed by the Defendants, the Defendants routinely billed GEICO for exorbitantly priced topical Lidocaine 5% Ointment, pursuant to duplicitous prescriptions solicited from the Prescribing Providers and Clinic Controllers in exchange for kickbacks or other incentives.

92.     Lidocaine 5% Ointment is primarily indicated for temporary pain relief associated with minor burns and skin irritations such as sunburn, insect bites, poison ivy, poison oak, poison sumac abrasions of the skin and insect bites, or as a topical anesthetic for minor procedures such as sutures or injections.

93.     Lidocaine is a local anesthetic (numbing medication) that works by blocking nerve signals in the top few millimeters of skin.  Lidocaine does not penetrate the skin enough to treat deep musculoskeletal pain.

94.     Excessive dosage or short intervals between doses of Lidocaine 5% Ointment can cause serious adverse effects including, among others, bradycardia, hypotension, and cardiovascular collapse that may lead to cardiac arrest. Accordingly, patients should be instructed to strictly adhere to the recommended dosage and a single application of Lidocaine 5% Ointment should not exceed 5 grams.

95.     Despite this, the Prescribing Providers never recommended Insureds first use over-the-counter lidocaine ointments or lotions to treat their minor aches and pains which they sustained in fender-bender type motor vehicle accidents. Rather, pursuant to collusive arrangements and predetermined protocols, the Prescribing Providers and Clinic Controllers routinely prescribed to Insureds, or caused the prescription of, Lidocaine 5% Ointment and directed the prescriptions to Time to Care.

96.     Further, to the extent that topical lidocaine ointment is effective for treating certain specific conditions, the Lidocaine 5% Ointment dispensed by the Defendants is only marginally stronger or more effective than OTC 4% lidocaine yet costs exponentially more. Rather than provide more conservative, cost-effective treatment, the Prescribing Providers, pursuant to their collusive agreements with the Defendants, virtually never directed the Insureds to try OTC 4% lidocaine prior to prescribing the Lidocaine 5% Ointment, in order to exploit the Insureds for financial gain.

97.     For example, the Prescribing Providers never recommended insureds first try Icy Hot Lidocaine or Aspercreme with Lidocaine, both of which contain 4% lidocaine and are available in a 2.7 oz. tube at most well-known pharmacy retailers at a mere fraction of the cost, including Rite-Aid and Target for advertised prices around $10.00.

98.   In keeping with the fact that the Defendants submitted bills pursuant to collusive arrangements with the Prescribing Providers and Clinic Controllers and pursuant to fraudulent, predetermined and profit-driven treatment protocols, the Lidocaine 5% Ointment prescriptions were often issued contemporaneous to oral NSAIDs, muscle relaxers and/or other Fraudulent Topical Pain Products such as Topical Diclofenac.  For example:

i.   Insured NA was allegedly involved in a motor vehicle accident on October 29, 2019. Thereafter, N.A. sought treatment with Metropolitan Medical at a No-Fault Clinic located at 2076 East 13th Street, Brooklyn, New York, and underwent an initial examination with Dr. Gladstein on January 15, 2020. Dr. Gladstein prescribed Lidocaine 5% Ointment, Naproxen, and Cyclobenzaprine which were dispensed and billed by Time to Care on January 16, 2020.

ii.   Insured SS was allegedly involved in a motor vehicle accident on September 25, 2019. Thereafter, S.S. sought treatment with Metropolitan Medical at a No-Fault Clinic located at 2076 East 13th Street, Brooklyn, New York, and underwent an initial examination with Dr. Gladstein on October 23, 2019. Dr. Gladstein prescribed Lidocaine 5% Ointment, Naproxen, and Baclofen which were dispensed and billed by Time to Care on October 23, 2019.

iii.   Insured LW was allegedly involved in a motor vehicle accident on February 18, 2020. Thereafter, L.W. sought treatment with Metropolitan at a No-Fault Clinic located at 560 Prospect Avenue, Bronx, New York, and underwent an initial examination with Igbokwe PA on March 19, 2020. PA Igbokwe prescribed Diclofenac Sodium Gel 3% and Lidocaine 5% Ointment.  On March 23, 2020, Time to Care dispensed and billed for Diclofenac Sodium Gel 3% and Lidocaine 5% Ointment pursuant to PA Igbokwe's prescription.

iv.   Insured CS was allegedly involved in a motor vehicle accident on July 8, 2019. Thereafter, C.S. sought treatment with Metropolitan Medical at a No-Fault Clinic located at 560 Prospect Avenue, Bronx, New York, and underwent an initial examination with PA Igbokwe on August 8, 2019. PA Igbokwe prescribed Diclofenac Sodium Gel 3% and Cyclobenzaprine which were dispensed and billed by M&D Elite on August 12, 2019. Subsequently, C.S. sought treatment with Metropolitan Medical at a No-Fault Clinic located at 2076 East 13th Street, Brooklyn, New York, and underwent an outpatient visit with Dr. Gladstein on January 22, 2020. Dr. Gladstein prescribed Lidocaine 5% Ointment, Baclofen, and Naproxen. On January 23, 2020, Time to Care dispensed and billed for Lidocaine 5% Ointment and Naproxen pursuant to Dr. Gladstein's prescription.

v.     Insured RC was allegedly involved in a motor vehicle accident on December 22, 2019. Thereafter, R.C. sought treatment with Jordan Fersel, M.D., P.C. at a No-Fault Clinic located at 2625 Atlantic Avenue, Brooklyn, New York, and underwent an initial examination with Jordan Fersel, M.D. ("Dr. Fersel") on January 3, 2020. Dr. Fersel prescribed Diclofenac Sodium Gel 3% which was dispensed and billed by M&D Elite on January 6, 2020. Subsequently, R.C. sought treatment with Metropolitan Medical at a No-Fault Clinic located at 2625 Atlantic Avenue, Brooklyn, New York, and underwent an initial examination with Igor Zilberman, N.P. ("Zilberman") on January 30, 2020. Zilberman prescribed Lidocaine 5% Ointment and Cyclobenzaprine which were dispensed and billed by Time to Care on February 3, 2020.

vi.     Insured RS was allegedly involved in a motor vehicle accident on January 10, 2020. Thereafter, R.S. sought treatment with Metropolitan Medical at a No-Fault Clinic located at 86-01 101st Ozone Park, New York, and underwent an initial examination with PA Butschek on February 25, 2020. PA Butschek prescribed Lidocaine 5% Ointment, Cyclobenzaprine, and Naproxen which were dispensed and billed by Time to Care on February 26, 2020.

vii.     Insured BL was allegedly involved in a motor vehicle accident on May 15, 2019. Thereafter, B.L. sought treatment with Metropolitan Medical at a No-Fault Clinic located at 1611 East New York Avenue, Brooklyn, New York, and underwent an initial examination with PA Igbokwe on September 23, 2019. PA Igbokwe prescribed Diclofenac Sodium Gel 3% which Time to Care dispensed and billed on September 25, 2019. Subsequently, on October 16, 2019, B.L. sought treatment with Metropolitan Medical at a No-Fault Clinic located at 2076 East 13th Street, Brooklyn, New York with Dr, Gladstein.  Despite the inherent risks of therapeutic duplication, Dr. Gladstein prescribed Lidocaine 5% Ointment, Naproxen, and Baclofen.  On October 17, 2019, Time to Care dispensed and billed for Lidocaine 5% Ointment, Naproxen, and Baclofen pursuant to Dr. Gladstein's prescription.

viii.     Insured MD was allegedly involved in a motor vehicle accident on June 5, 2018. Thereafter, M.D. sought treatment with Metropolitan Medical at a No-Fault Clinic located at 218 Hempstead Avenue, Queens Village, New York, and underwent an examination with Dr. Gladstein on December 3, 2019. Dr. Gladstein prescribed Lidocaine 5% Ointment, Naproxen, and Baclofen which were dispensed and billed by Time to Care on December 4, 2019.

ix.     Insured SI was allegedly involved in a motor vehicle accident on January 8, 2020. Thereafter, S.I. sought treatment with QR Medical Services, P.C. at a No-Fault Clinic located at 1568 Ralph Avenue, Brooklyn, New York, and underwent an initial consultation and Lidocaine injections with Dr. Zakaria on January 13, 2020. Dr. Zakaria prescribed Lidocaine 5% Ointment, Cyclobenzaprine, and Ibuprofen which were dispensed and billed by Time to Care on January 15, 2020.

x.  Insured DA was allegedly involved in a motor vehicle accident on September 10, 2019. Thereafter, D.A. sought treatment with Metropolitan Medical at a No-Fault Clinic located at 2076 East 13th Street, Brooklyn, New York, and underwent an initial examination with Dr. Gladstein on February 19, 2020. Dr. Gladstein prescribed Lidocaine 5% Ointment, Naproxen, and Baclofen which were dispensed and billed by Time to Care on February 19, 2020.

99.  As with the prescriptions for Topical Diclofenac, the initial examination reports prepared by the Prescribing Providers virtually never set forth the medical basis for the Lidocaine 5% Ointment prescriptions and, in some cases, failed to acknowledge that the patient was even being prescribed a Lidocaine 5% Ointment. Likewise, the follow-up examination reports virtually never addressed whether the Lidocaine 5% Ointment prescribed provided any pain relief to the patient or was otherwise effective for the purpose prescribed, to what degree, or whether the patients experienced any side effects.

100.  Time to Care typically billed GEICO $1,219.04 for a single tube of Lidocaine 5% Ointment and, to-date, has submitted over $983,357.00 in claims to GEICO seeking reimbursement of Lidocaine 5% Ointment.

101.  The Defendants' egregious billing coupled with the fact that the Prescribing Providers failed to properly document – or even document at all – the prescriptions for Topical Diclofenac and Lidocaine 5% Ointment, or the Insureds' use of these medications, further indicates that there was no legitimate medical reason for the Prescribing Providers to have prescribed large volumes of these medications to the Insureds, or for Time to Care to have dispensed such large volumes to the Insureds, particularly given the potential for adverse health effects.

**C.  The Exploiting of Patients for Financial Gain Through the Illegal, Collusive Arrangements Among Time to Care, the Prescribing Providers and the Clinic Controllers**

102.  To effectuate the fraudulent scheme, the Defendants steered the Prescribing Providers and Clinic Controllers to routinely prescribe and direct prescriptions to Time to Care for

large volumes of the Fraudulent Topical Pain Products pursuant to their collusive arrangements, which egregiously inflated the charges submitted to GEICO.

103.    New York's statutory framework provides, among other things, that pharmacies and licensed medical professionals are prohibited from (i) "exercising undue influence" on a patient by promoting the sale of drugs so as to exploit the patient for the financial gain, and (ii) "directly or indirectly" giving, soliciting, receiving, or agreeing to receive any fee or other consideration to or from a third party in connection with the performance of professional services.

104.    New York's statutory framework also specifically prohibits collusive arrangements between licensed physicians and pharmacies involving compounded or specially marked prescriptions. See N.Y. Education Law § 6530(38) and § 6811(7).  In fact, New York Education Law § 6811(7) makes such agreements criminal.

105.    Here, the Defendants colluded with the Prescribing Providers and Clinic Controllers associated with various No-Fault Clinics, which treat thousands of Insureds, to have the Prescribing Providers, prescribe, or purport to prescribe, the Fraudulent Pharmaceuticals, including the Fraudulent Topical Pain Products, and then to have those prescriptions directed to Time to Care so that the Defendants could bill GEICO huge sums.

106.    In furtherance of the scheme, the Prescribing Providers intentionally prescribed, or purported to prescribe, the Fraudulent Pharmaceuticals to patients of the No-Fault Clinics pursuant to the collusive arrangements and fraudulent predetermined protocols, and without regard to genuine patient care, without regard to cost and attention to fiscal responsibility, and often without regard to pharmacologic outcomes.

107.    In keeping with the fact that the Fraudulent Pharmaceuticals dispensed by Time to Care were prescribed pursuant to collusive arrangements and predetermined protocols rather than

genuine patient care, the Defendants created and distributed to certain Prescribing Providers what is essentially a product list – disguised as a "prescription order form" – of the various Fraudulent Pharmaceuticals that Time to Care dispensed.

108.    The pre-printed "checklist-type" prescription order forms (the "Fraudulent Prescription Forms") created by the Defendants listed Time to Care's name, address, and phone and fax numbers, along with the names of the Fraudulent Pharmaceuticals, the strength and quantity in which they were to be prescribed and dispensed to Insureds, and, in some instances, directions on how often to take or apply the medication prescribed.

109.    The Fraudulent Prescription Forms ensured that the Prescribing Provider would prescribe predetermined Fraudulent Topical Pain Products, such as Diclofenac Sodium 3% Gel and Lidocaine 5% Ointment, which Time to Care could then bill for at egregiously inflated rates.

110.    Additionally, to further the profits generated through Time to Care, the Fraudulent Prescription Forms created by the Defendants allowed the Prescribing Provider to prescribe other Fraudulent Pharmaceuticals, including predetermined oral NSAIDs such as Meloxicam, Ibuprofen, Naproxen and Celecoxib; muscle relaxers such as Cyclobenzaprine, Baclofen, and Tizanidine; and Gabapentin.

111.    Time to Care's Fraudulent Prescription Forms did not provide the Prescribing Provider with the option to prescribe any pharmaceuticals other than those specified on the preprinted forms.

112.    A sample of Time to Care's Fraudulent Prescription Forms is annexed hereto as Exhibit "2".

113.    In other instances, the Defendants colluded with the Prescribing Providers and Clinic Controllers associated with various No-Fault Clinics to steer facsimile, paper prescriptions to Time to Care for the Fraudulent Pharmaceuticals.

114.    Notably, New York law prohibits Time to Care from dispensing pharmaceuticals in response to pre-printed "checklist-type" prescription order forms or facsimile prescriptions that contain multiple drug products listed on the same form, and likewise prohibits the Prescribing Providers from writing prescriptions on these types of forms.

115.    Specifically, New York Education Law § 6810(7) provides as follows:

> "No prescription for a drug written in this state by a person authorized to issue such prescription shall be on a prescription form which authorizes the dispensing or compounding of any other drug. No drug shall be dispensed by a pharmacist when such prescription form includes any other drug."

116.    In other words, the Education Law prohibits pharmacists from dispensing multiple drugs listed on the same prescription – each prescription medication should be written on its own separate prescription.  Id.

117.    Moreover, as of March 27, 2016, to combat the growing problem of prescription fraud, N.Y. Public Health Law requires that all prescriptions issued in New York State – for both controlled and non-controlled substances – must be prescribed electronically.

118.    In the limited circumstances in which a prescription is excepted from the electronic prescription requirement, N.Y. Public Health Law requires that a written prescription in New York State be written on an official *serialized* New York State prescription bearing the prescriber's signature as well as the legible, conspicuous imprinted or stamped name of the authorized prescribing healthcare provider.   See, N.Y. Public Health Law § 281, see also N.Y. Education Law § 6810(8).

119.    Time to Care, in an effort to conceal the illegal use of the facsimile paper prescriptions, inputted those prescriptions into its own electronic system and created an electronic record of the prescription, but such act does change the impropriety of the facsimile paper prescriptions or Time to Care's impropriety in filling those prescriptions.

120.    Both Time to Care's Fraudulent Prescription Forms and the other facsimile paper prescriptions it received are invalid and illegal in that they are not electronic prescriptions nor are they official serialized New York State prescriptions bearing the legible, conspicuous imprinted or stamped name of the authorized prescribing healthcare provider.

121.    The Defendants ignored the regulatory requirements relating to the prescriptions and colluded with the Prescribing Providers and Clinic Controllers associated with various No-Fault Clinics, which treat thousands of Insureds, to have the Prescribing Providers prescribe, or purport to prescribe, the Fraudulent Pharmaceuticals, including the Fraudulent Topical Pain Products, in large volumes, so that the Defendants could bill GEICO huge sums.

122.    The Prescribing Providers prescribed, or purported to prescribe, the Fraudulent Pharmaceuticals to patients of the No-Fault Clinics, while the Defendants dispensed, or purported to dispense the Fraudulent Pharmaceuticals, despite their knowledge that they were involved in illegal, collusive arrangements designed to exploit the patients for financial gain; the Fraudulent Pharmaceuticals were often prescribed and dispensed without regard to pharmacologic outcomes; the Fraudulent Pharmaceuticals were prescribed and dispensed with gross indifference to patient health, care and safety; the Fraudulent Topical Pain Products were prescribed and dispensed as a matter of course without any recommendation that patients first try over-the-counter products; and that the Fraudulent Topical Pain Products were prescribed and dispensed without any attention to

cost and fiscal responsibility, given that there are FDA-approved drugs available and appropriate for the particular patients at significantly less cost.

123.     The Defendants, in collusion with the Prescribing Providers and Clinic Controllers, made sure that the Insureds never had the option to use a pharmacy of their choosing, and instead ensured that the prescriptions for the Fraudulent Pharmaceuticals were directed to Time to Care, notwithstanding that (i) in many instances the No-Fault Clinics and the patients themselves were located in counties far from Time to Care in Nassau County, New York and (ii) there were countless other pharmacies located much closer to the No-Fault Clinics and the patients.

124.     In many cases, Time to Care purported to mail or deliver the Fraudulent Pharmaceuticals directly to the Insureds' homes without the patient even knowing that they were to receive a Fraudulent Pharmaceutical.

125.     Alternatively, the Insureds were given the Fraudulent Pharmaceuticals dispensed by Time to Care directly from the front desk staff at the various No-Fault Clinics, again without ever even knowing that they were to receive a Fraudulent Pharmaceutical.

126.     The Defendants, the Prescribing Providers and the Clinic Controllers did not give the Insureds the option to identify a pharmacy of their choosing to ensure that the prescriptions were filled by Time to Care, and to ensure that the Defendants benefitted financially from the prescriptions.

127.     The Prescribing Providers had no legitimate medical reason to prescribe the Fraudulent Pharmaceuticals in large quantities to their patients.

128.     The Prescribing Providers and the Clinic Controllers had no legitimate reason to direct the prescriptions for the Fraudulent Pharmaceuticals to Time to Care rather than to a

multitude of other pharmacies that were equally capable of dispensing the prescriptions and often more convenient to many of the patients.

129.     The Defendants, the Prescribing Providers and the Clinic Controllers would not have engaged in the illegal, collusive arrangements in violation of New York law, including intentionally prescribing the Fraudulent Pharmaceuticals and directing those prescriptions to Time to Care, unless they profited from their participation in the illegal scheme.

130.     But for the payments of kickbacks or other financial incentives from the Defendants, the Prescribing Providers would not have prescribed the Fraudulent Topical Pain Products, or the volume of other Fraudulent Pharmaceuticals, and the Prescribing Providers and Clinic Controllers would not have directed the prescriptions to Time to Care.

131.     The Defendants, Prescribing Providers, and Clinic Controllers affirmatively concealed the particular amounts paid for the kickbacks since such kickbacks are in violation of New York law.

132.     Nevertheless, based on the circumstances surrounding the illegal, collusive, arrangements, the issuance of suspect checks, and the check-cashing activity,  the Defendants paid a financial kickback or provided other financial incentives, and the Prescribing Providers and Clinic Controllers received a financial kickback or other financial incentives, for each of the particular prescriptions for the Fraudulent Pharmaceuticals that were dispensed by Time to Care.

133.     Upon information and belief, the payment of kickbacks by the Defendants was made at or near the time the prescriptions were issued.

**D.**     **The Fraudulent Billing the Defendants Submitted or Cause to be Submitted to GEICO**

134.     Every prescription product, whether a brand name or generic drug, has a designated national drug code ("NDC") – a unique 10-digit code that identifies the drug itself, the vendor of

the drug and the quantity in which the drug was packaged.  Each NDC number has an assigned Average Wholesale Price ("AWP").

135.    Each NDC (and, thus, the AWP) for a particular prescription product differs depending on both the particular supplier the drug is purchased from and the quantity in which the drug is obtained.  The same drug can have a different NDC number if it is purchased from a different supplier and/or in different quantities.

136.    Pursuant to 12 N.Y.C.R.R. §§ 440.5(a) and (d) (the "Pharmacy Fee schedule"), for each brand name drug (or ingredient included in a compounded product) a provider may charge no more than the AWP assigned to that particular NDC on the day the drug was dispensed minus 12% of the AWP, plus a single dispensing fee of $4.00.

137.    For each generic drug (or ingredient included in a compounded product) the provider may charge no more than the AWP assigned to that particular NDC on the day the drug was dispensed minus 20% of the AWP, plus a single dispensing fee of $5.00.

138.    The Defendants solicited the Clinic Controllers and the Prescribing Providers to provide them with voluminous prescriptions for the Fraudulent Topical Pain Products because the Defendants could readily buy the Fraudulent Topical Pain Products at low cost but bill GEICO and other New York No-Fault insurers inflated amounts based on egregiously high wholesale prices.

139.    The Defendants intentionally targeted the Fraudulent Topical Pain Products, with extremely expensive "average wholesale prices," in order to inflate Time to Care's billing and maximize their profits.

140.    In support of their charges, the Defendants typically submitted: (i) the Prescribing Providers' prescription; (ii) a "No-Fault" form, known as an NF-3 Form, which included the

purported NDC numbers, units, and corresponding charges for each drug product or ingredient; (iii) an itemized invoice which included the Insureds' demographics, dates the prescription was purportedly filled, the purported NDC numbers, units, and corresponding charges, and the name of the Prescribing Provider; (iv) a delivery slip; and (v) the executed assignment of benefits form ("AOB") assigning the Insureds' benefits to the Defendants.

141.    The NDC numbers listed on the NF-3 Forms submitted by the Defendants are what identified the purported AWPs for each of the Fraudulent Pharmaceuticals.

142.    The Defendants never submitted to GEICO their wholesale purchase invoices demonstrating how much Time to Care actually paid the supplier for the Fraudulent Topical Pain Products.

143.    The Defendants never submitted to GEICO any documents evidencing whether Time to Care actually purchased topical pain products with the particular NDC number used in the billing, representing purchases from a particular supplier in a particular quantity.

144.    In fact, Time to Care never actually paid the targeted and egregious "average wholesale price" of the Fraudulent Topical Pain Products that it dispensed, or purported to dispense, because it is not a true representation of actual market price and is far above the actual acquisition cost for Fraudulent Topical Pain Products.

145.    Time to Care paid only a fraction of the "average wholesale price" of the Topical Diclofenac that the Defendants targeted to use in connection with Time to Care's billing, but nevertheless billed GEICO and other No-Fault insurers egregious amounts far surpassing the cost of an array of other FDA approved, proven effective medications or commercially available over-the-counter products.

146.    Further, upon information and belief, Time to Care often did not actually purchase topical pain products with the particular NDC number used in the billing, and instead purchased topical pain products from different suppliers and/or in different quantities but nonetheless used the NDC number in their billing that generated the highest reimbursement amount in order to inflate the Defendants' profits.

## IV.    The Defendants' Submission of Fraudulent NF-3 Forms to GEICO

147.    To support the fraudulent charges, statutorily prescribed claim forms for No-Fault Benefits consistently have been submitted to GEICO by and on behalf of Time to Care seeking payment for pharmaceuticals for which Time to Care is ineligible to receive.

148.    These forms, including NF-3 forms, HCFA-1500 forms and other supporting records that the Defendants submit or cause to be submitted to GEICO, are false and misleading in the following material respects:

i.     The NF-3 forms, HCFA-1500 forms, and other supporting records uniformly misrepresented to GEICO that the Fraudulent Pharmaceuticals were medically necessary and intended for genuine patient care. In fact, the Fraudulent Pharmaceuticals were not medically necessary and were the product of predetermined fraudulent protocols designed to exploit the patients for financial gain without regard for genuine patient care;

ii.    The NF-3 forms, HCFA-1500 forms, and other supporting records uniformly misrepresented to GEICO that the Defendants were in compliance with all material licensing requirements and, therefore, are eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12). In fact, the Defendants did not comply with all material licensing requirements in that the Defendants engaged in illegal, collusive relationships with the Prescribing Providers and Clinic Controllers in order to steer voluminous and illegal prescriptions to Time to Care for the Fraudulent Pharmaceuticals, in exchange for the payment of kickbacks and other financial incentives;

iii.   The NF-3 forms, HCFA-1500 forms, and other supporting records uniformly misrepresented to GEICO that the Defendants were in compliance with all material licensing requirements and, therefore, are eligible to receive No-Fault Benefits pursuant to Insurance Law §

5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12).  In fact, the Defendants did not comply with all material licensing requirements in that they dispensed the Fraudulent Pharmaceuticals pursuant to illegal, invalid, and duplicitous prescriptions; and

iv.      The NF-3 forms, HCFA-1500 forms and other supporting records uniformly misrepresented to GEICO that the Defendants were in compliance with all material licensing requirements and, therefore, are eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12).  In fact, the Defendants did not comply with all material licensing requirements in that the Defendants intentionally targeted a specific set of pharmaceutical products that they could acquire at low cost and dispense in large volumes to Insureds at egregious charges, in place of other effective, less costly pharmaceuticals.

## V.      **The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance**

149.     The Defendants are legally and ethically obligated to act honestly and with integrity in connection with the provision of pharmaceutical products to the Insureds and the billing they submit or cause to be submitted to GEICO seeking reimbursement for these products.

150.     To induce GEICO to promptly pay the charges for the Fraudulent Pharmaceuticals, the Defendants have gone to great lengths to systematically conceal their fraud.

151.     Specifically, the Defendants knowingly misrepresented and concealed facts in an effort to prevent discovery that (i) the Fraudulent Pharmaceuticals were prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; and (ii) the Defendants were involved in collusive kickback arrangements with the Prescribing Providers and Clinic Controllers designed to generate voluminous prescriptions solely to maximize the billing submitted to GEICO and other New York insurance companies.

152.     The Defendants also billed for the Fraudulent Pharmaceuticals based on purported prescriptions from multiple Prescribing Providers operating from multiple No-Fault Clinics in order to reduce the amount of billing based on any single licensee.

153.    The billing and supporting documentation submitted by the Defendants for the Fraudulent Pharmaceuticals, when viewed in isolation, did not reveal its fraudulent nature.

154.    The Defendants have hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers. These law firms routinely file expensive and time-consuming litigation against GEICO and other insurers if the charges are not promptly paid in full.  In fact, Time to Care continues to have legal counsel pursue collection against GEICO and other insurers without regard for the fact that Time to Care has been engaged in fraud.

155.    GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days.  GEICO also ensures that No-fault claim denial forms or requests for additional verification of No-fault claims are properly addressed and mailed in a timely manner.

156.    The facially-valid documents that were submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO has incurred damages of approximately $345,218.00 representing payments made by GEICO based upon the fraudulent charges submitted by the Defendants.

157.    Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

<u>**THE FIRST CLAIM FOR RELIEF**</u>
**Against All Defendants**
**(Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)**

158.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

159.   There is an actual case in controversy between GEICO and the Defendants regarding approximately $1,073,819.00 in fraudulent billing for the Fraudulent Pharmaceuticals that the Defendants submitted or caused to be submitted to GEICO through Time to Care.

160.   Time to Care has no right to receive payment for any pending bills submitted to GEICO for the Fraudulent Pharmaceuticals because Time to Care billed for pharmaceutical products that were medical unnecessary, and prescribed and dispensed pursuant to illegal, collusive agreements, and predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care.

161.   Time to Care has no right to receive payment for any pending bills submitted to GEICO because the Defendants participated in illegal, collusive relationships in which the Defendants steered the Prescribing Providers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to Time to Care in exchange for unlawful kickbacks and other financial incentives.

162.   Time to Care has no right to receive payment for any pending bills submitted to GEICO for the Fraudulent Pharmaceuticals because the Defendants intentionally targeted a specific set of pharmaceutical products (i.e., the Fraudulent Topical Pain Products) that they acquired at low cost and had Time to Care dispense in large volumes to Insureds at egregious charges, in place of other effective, less costly pharmaceuticals solely for financial gain in violation of law.

163.   Time to Care has no right to receive payment for any pending bills submitted to GEICO for the Fraudulent Pharmaceuticals because the Defendants made and continue to make false and fraudulent misrepresentations to GEICO by submitting or causing to be submitted

charges for the Fraudulent Pharmaceuticals dispensed by Time to Care pursuant to the illegal, invalid, duplicitous, and altered prescriptions.

164.    The Defendants, including Time to Care, violated New York State regulatory and licensing requirements, rendering the pharmacy ineligible to receive reimbursement for No-Fault Benefits.

165.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Time to Care has no right to receive payment for any pending bills submitted to GEICO.

### THE SECOND CLAIM FOR RELIEF
**Against Tabulov**
**Violation of RICO, 18 U.S.C. § 1962(c))**

166.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

167.    Time to Care is an ongoing "enterprise", as that term is defined in 18 U.S.C § 1961(4), that engages in activities which affect interstate commerce.

168.    Tabulov knowingly has conducted and/or participated, directly or indirectly, in the conduct of Time to Care's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of United States mail to submit or cause to be submitted thousands of fraudulent charges for over one year, seeking payments that Time to Care was not eligible to receive under the No-Fault Laws because: (i) the billed-for services were not medically necessary and/or the product of predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) the Defendants participated in illegal, collusive relationships in which the Defendants steered the Prescribing Providers and Clinic Controllers to direct illegal prescriptions for the

Fraudulent Pharmaceuticals to Time to Care in exchange for unlawful kickbacks and other financial incentives; (iii) the Defendants intentionally targeted a specific set of pharmaceuticals that they dispensed in large volumes to Insureds with exorbitant charges, in place, of other effective, less costly pharmaceuticals solely for financial gain, in violation of law; and (iv) the billed-for services were the product of illegal, invalid, and duplicitous prescriptions. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

169.    Time to Care's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Tabulov operated Time to Care, inasmuch as Time to Care was never eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for Time to Care to function.  Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants actively continue to attempt collection on the fraudulent billing submitted through Time to Care to the present day.

170.    Time to Care is inherently unlawful acts inasmuch as its very existence is an unlawful act, considering that it was created to exploit the New York "No-Fault" insurance system; engage in illegal, collusive arrangements involving prescriptions for the Fraudulent Pharmaceuticals; and bill pursuant to predetermined fraudulent protocols solely to financially enrich the Defendants. These inherently unlawful acts are taken by Time to Care in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

171.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid approximately $345,218.00 pursuant to the fraudulent bills submitted by the Defendants.

172.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fee pursuant to 18 U.S.C. § 1961(4), any other relief the Court deems just and proper.

## THE THIRD CLAIM FOR RELIEF
### Against Tabulov and John Doe Nos. "1" through "5"
### (Violation of RICO, 18 U.S.C. § 1962(d))

173.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

174.    Time to Care is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

175.    Tabulov and John Doe Nos. "1" through "5" are employed by or associated with the Masood Chiropractic enterprise.

176.    Tabulov and John Doe Nos. "1" through "5" knowingly have agreed, combined, and conspired to conduct and/or participate, directly or indirectly, in the conduct of Time to Care's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges seeking payments that Time to Care was not eligible to receive under the New York no-fault insurance laws because: (i) the billed-for services were not medically necessary and/or the product of predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) the Defendants participated in illegal, collusive relationships in which the Defendants steered the Prescribing Providers and Clinic Controllers to direct illegal prescriptions for the Fraudulent

Pharmaceuticals to Time to Care in exchange for unlawful kickbacks and other financial incentives; (iii) the Defendants intentionally targeted a specific set of pharmaceuticals that they dispensed in large volumes to Insureds with exorbitant charges, in place, of other effective, less costly pharmaceuticals solely for financial gain, in violation of law; and (iv) the billed-for services were the product of illegal, invalid, and duplicitous prescriptions.  A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "1."

177.   Tabulov and John Doe Nos. "1" through "5" knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

178.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $345,218.00 pursuant to the fraudulent bills for the Fraudulent Services submitted through Time to Care.

179.   By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## THE FOURTH CLAIM FOR RELIEF
### Against All Defendants
### (Common Law Fraud)

180.   GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

181.   The Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their

submission of thousands of fraudulent charges seeking payment for the Fraudulent Pharmaceuticals under the name of Time to Care.

182.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that the billed-for services were medically necessary and properly billed when in fact the billed-for services were not medically necessary and/or were the product of predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) in every claim, the representation that Time to Care was acting in accordance with material licensing requirements and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the Defendants participated in illegal, collusive relationships in which the Defendants steered the Prescribing Providers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to Time to Care in exchange for unlawful kickbacks and other financial incentives; (iii) in every claim, the representation that Time to Care was acting in accordance with material licensing requirements and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the billed-for services were the product of illegal, invalid, duplicitous, and altered prescriptions; and (iv) in every claim, the representation that Time to Care was acting in accordance with material licensing requirements and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the Defendants intentionally targeted a specific set of pharmaceutical products that they could acquire at low cost and dispense in large volumes to Insureds with inflated charges, in place of other effective, less costly pharmaceuticals solely for financial gain in violation of law.

183.    The Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Time to Care that were not compensable under the No-Fault Laws.

184.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid approximately $345,218.00 pursuant to the fraudulent bills submitted, or caused to be submitted, by the Defendants through Time to Care.

185.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

186.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### THE FIFTH CLAIM FOR RELIEF
**Against All Defendants**
**(Unjust Enrichment)**

187.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

188.    As set forth above, the Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

189.    When GEICO paid the bills and charges submitted by or on behalf of Time to Care for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

190.    The Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that the Defendants voluntarily accepted and profited from, as a result

of, among other things, the payments received, notwithstanding their improper, unlawful, and unjust fraudulent billing scheme.

191.    The Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

192.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in the approximate amount of $345,218.00.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company demand that a judgment be entered in their favor and against the Defendants, as follows:

A.    On the First Claim for Relief against the Defendants, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Time to Care has no right to receive payment for any pending bills, amounting to approximately $1,073,819.00 in charges submitted to GEICO;

B.    On the Second Claim For Relief against Tabulov, compensatory damages in favor of GEICO in an amount to be determined at trial but approximately $345,218.00, together with treble damages, punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

C.    On the Third Claim For Relief against the Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but approximately $345,218.00, together with treble damages, punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

D.    On the Fourth Claim for Relief against the Defendants, a recovery in favor of GEICO in an amount to be determined at trial but approximately $345,218.00 together with

punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

E.      On the Fifth Claim for Relief against all the Defendants, a recovery in favor of GEICO in an amount to be determined at trial but approximately $345,218.00, together with punitive damages.

Dated: Uniondale, New York
         April 14, 2022

RIVKIN RADLER LLP

By:   /s/ *Michael A. Sirignano, Esq.*
         Michael A. Sirignano (MS 5263)
         Barry I. Levy (BL 2190)
         Priscilla D. Kam (PK 1505)
         Vincent J. Pontrello (VP 0848)
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs, Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company*